UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEX RIVERA GIORGES, et al.,<br><br>   Plaintiffs,<br><br>v.<br><br>POLLY KAISER, et al.,<br><br>   Defendants. | Case No. 25-cv-07683-NW<br><br>**ORDER DENYING PETITIONER-PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Re: ECF No. 3 |

Before the Court are two unrelated, non-U.S. citizens who have lived continuously in the United States since they were children, Mr. Alex Rivera Giorges (Rivera) from the age of eleven, and Mr. Sokha Khan since he was two years old.[1] Both men committed aggravated felonies while in their twenties, served their sentences, and when paroled were immediately detained by Immigration and Customs Enforcement ("ICE") for removal proceedings. In a 2020 class action lawsuit brought during the COVID-19 pandemic, a United States District Court judge determined in a bond hearing that neither man was a danger to public safety or a flight risk, and both men were released from ICE detention. For more than five years the men have had meaningful family relationships, been engaged in their communities, and led law-abiding lives.

---

[1] At the hearing on the temporary restraining order, pro bono counsel explained that they had consolidated Rivera's and Khan's habeas applications into a single action to preserve resources. The Government noted the procedural anomaly in a footnote. *See* Opp. at 13 n.6; *Est. of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014) ("Arguments raised only in footnotes, or only on reply, are generally deemed waived."). The appropriate remedy for improper joinder would be to sever each Petitioner's claims and require each Petitioner to proceed in a separate action, not to deny relief. *See Acord v. California*, No. 17-cv-01089-MJS (HC), 2017 WL 4699835, at *1 (E.D. Cal. Oct. 19, 2017). The government did not file a motion to sever so the issue is not before the Court.

Now, Petitioners ask the Court to enjoin the Government from re-detaining either of them absent evidence that they pose a current flight risk or danger to the community. To re-detain them, Petitioners argue, would deny Petitioners the process that they are due under the Fifth Amendment. In response, the Government contends that Petitioners are subject to detention provisions that the Supreme Court has found to be constitutionally sound without requiring a pre-deprivation hearing. This Court must decide how long, if at all, the United States may hold Petitioners in detention without a bond hearing before an Immigration Judge ("IJ") who will determine whether either should be released pending the outcome of their immigration proceedings.

Based on the facts currently before the Court, the plain language of Title 8 of the U.S. Code (the Immigration and Nationality Act ("INA")) (specifically §§ 1223(c) and 1231(a)), and binding Supreme Court and Ninth Circuit decisions, the Government may re-detain Petitioners without running afoul of the Fifth Amendment. The Due Process Clause does not allow for Petitioners to be detained indefinitely, but Petitioners are not currently detained, and they have not established that they are likely to face indefinite detention going forward. Accordingly, the Court finds that Petitioners have not demonstrated that they are likely to succeed on the merits and DENIES the preliminary injunction.

I.  **BACKGROUND**

   A.  ***Zepeda Rivas*** **Class Action**

Petitioners are members of the class that litigated *Zepeda Rivas v. Jennings*, No. 20-cv-02731-VC (N.D. Cal. filed April 20, 2020) (hereinafter "*Zepeda Rivas*"). Filed shortly after the onset of the pandemic, the suit challenged the crowded custody conditions in the ICE San Francisco Field Office's detention centers, including at the Yuba County Jail, that exposed detainees to COVID-19 infection and related health complications. Many of the class members, including Rivera and Khan, had serious criminal convictions that stripped them of legal status in the United States and required their detention pending a final order of removal. But, due to the COVID-19 public health emergency, petitioners argued that the statutory presumption that their

detention validly served those purposes should give way to individualized review by a federal judge. *Id.* at 40. The *Zepeda Rivas* court agreed.

On April 29, 2020, the judge granted provisional class certification and issued a temporary restraining order. *Zepeda Rivas v. Jennings*, 445 F. Supp. 3d 36 (N.D. Cal. 2020). The order created a process for each class member to submit an individual bail application with specific information, including the applicants' criminal history, for the Court's consideration. *Id*. at 41-42. The Court would then assess each application and "avoid releasing detainees who [we]re a danger to the community and . . . minimize the possibility that released detainees [would] fail to appear for their removal proceedings." *Id*. at 40.

### B.     Mr. Alex Rivera Giorges

#### 1.     Background

Rivera was born in El Salvador where he had a traumatic childhood. When he was very young his parents left for the United States, and Rivera lived with an aunt who emotionally and physically neglected him. On the rare occasions when his parents inquired about him, they did so only by talking to Rivera's aunt, never directly to him. As a child in El Salvador, Rivera witnessed shootings and murders, and endured physical abuse.

On August 6, 1980, when he was 11, Rivera entered the United States as a Lawful Permanent Resident. He lived with his parents in Los Angeles, California, where he continued to be neglected and physically abused. He was lonely and unsafe. Rivera sought protection among a gang of kids in his neighborhood. He began to get in fights, stole things, and spent time in a juvenile correctional facility. His negative associations and conduct continued into young adulthood. On July 29, 1992, when he was 22 years old, he was convicted of second-degree murder and conspiracy, and sentenced to fifteen years to life in prison, with the possibility of parole.

In 2014, having already served 22 years of his sentence, then 45-year-old Rivera was diagnosed with lymphoma. His six months of chemotherapy occurred in prison. During his treatment and remission, Rivera disassociated with all gang members. He earned his G.E.D., took

classes on criminal thinking, anger management, denial management, and participated in various self-help and rehabilitations groups including Careless Youth Corrected by Lifers' Experiences (CYCLE), and Criminals & Gang Members Anonymous (CGA). While incarcerated Mr. Rivera also participated in Alcoholics Anonymous. He has now been sober for 25 years.

In March 2019, the California Parole Board found that Rivera was suitable for release into the community and granted him parole. But when he was released on June 25, 2019, ICE immediately arrested and detained him at the Yuba County Jail in Marysville, California. Yuba County Jail has a troubled record for inmate conditions, including lack of medical care, inadequate hygiene, and excessive use of solitary confinement. *See, e.g.*, *Hedrick v. Grant*, No. 276CV00162-JAM-EFB, 2023 WL 5957608, at *7 (E.D. Cal. Sept. 13, 2023).

As discussed above, Rivera was a member of the class in *Zepeda Rivas.* On May 13, 2020, Rivera submitted his bail application pursuant to the *Zepeda Rivas* temporary restraining order. In his application Rivera explained he was not a danger to the community. He noted that, among other things, the California Parole Board found that he did not pose a risk to public safety when he was released on parole in June of 2019. Rivera's application also explained that he was not a flight risk because he had an extensive family network in California, had enrolled in transitional housing and re-entry programs, had pending applications for immigration relief, and had ongoing support from his *pro bono* attorney and social worker.

The judge granted Rivera's bail application on May 23, 2020, with the single condition that class counsel certify to ICE that space in the transitional housing facility was available for Rivera when he was released. Additionally, ICE fit Rivera with an ankle monitor. On June 4, 2020, ICE released Rivera from custody where he had been detained nine days shy of one year (since June 15, 2019).

A few months after his release, on October 1, 2020, ICE imposed additional monitoring conditions upon Rivera, including serving him with an Order of Supervision and enrolling him in the Intensive Supervision Appearance Program ("ISAP"), both of which require regular, in-person check-in appointments with ICE. Additionally, ICE monitored Rivera via a smartphone

4

application that also enabled virtual check-in appointments. Rivera has always reported as required for his Order of Supervision and ISAP check-ins, including after February 2025, when ICE elected to remove his ankle monitor. He has not had any new criminal arrests, charges, or convictions.

Almost immediately after his release, Rivera started working for a non-profit organization in the Bay Area that provides shelter to disabled and medically vulnerable, unhoused people. In his first year he was recognized as "Employee of the Month" twice. Rivera was later promoted to a supervisory position, and he remains employed at the organization to this day. Rivera also volunteers at local food banks, rides his bike, and has developed healthy friendships. He took courses to earn back his driver's license and diligently saved money until he was able to purchase a car and pay for car insurance. He has a bank account, pays taxes, and rents his apartment. In short, he has led a law-abiding life that demonstrates a commitment to his community.

### 2. Immigration Proceedings

The Government issued Rivera a Notice to Appear, dated June 20, 2019. On March 2, 2020, shortly before the COVID-19 pandemic instigated the *Zepeda Rivas* class action, an IJ issued an order denying Rivera relief from removal. Rivera appealed, and the Board of Immigration Appeals ("BIA") issued a decision denying that appeal on December 31, 2020, rendering the IJ's decision a final order of removal.[2] By the time the BIA issued its decision, Rivera was no longer in detention.

Despite the final order of removal, Rivera has continued to take steps to lawfully remain in the United States. Recently, the Ninth Circuit remanded his immigration case to the Executive

---

[2] A final order of removal is defined as "the order" of the IJ "concluding that the alien is deportable or ordering deportation." *Rizo v. Lynch*, 810 F.3d 688, 690 (9th Cir. 2016) (quoting 8 U.S.C. § 1101(a)(47)(A)). "By statute, an order of removal 'become[s] final upon' a decision of the BIA affirming that order or the expiration of the period for seeking BIA review." *Coria v. Garland*, 114 F.4th 994, 1001 (9th Cir. 2024), *cert. denied sub nom. Coria v. Bondi*, 145 S. Ct. 1961 (2025) (quoting 8 U.S.C. § 1101(a)(47)(B)); *Ordonez v. I.N.S.*, 345 F.3d 777, 784 (9th Cir. 2003) ("When the BIA dismisses an appeal from a final order of deportation, the IJ's order becomes the final order of deportation on the date of the BIA's decision.").

Office of Immigration Review (EOIR). Rivera has a pending motion with the Board of Immigration Appeals (BIA) to prevent his removal under the Convention Against Torture.

### C. Mr. Sokha Khan

#### 1. Background

Khan's parents fled their home country of Cambodia due to violence, political instability, and persecution. Initially they traveled to the Phanat Nikhom Refugee Camp in Chonburi Province, Thailand, where Khan was born in 1980. When Khan was two, his parents traveled to the United States where he has resided ever since. He has never been to Cambodia and has never been back to Thailand since he left as a baby.

On June 15, 1983, Khan was admitted as a refugee to the United States at San Francisco, California. His status was adjusted to Lawful Permanent Resident on November 29, 1989, retroactive to June 15, 1983, under section 209(a) of the Immigration and Nationality Act. His mother is now a United States citizen, and his father is a Lawful Permanent Resident.

On January 4, 2006, Khan pled nolo contendere to two felonies, first-degree and second-degree robbery, and was respectively sentenced to six years and fourteen years for those convictions. Khan had no prior criminal history when he pled to the charges. He was 25 years old, married, living in Stockton, California, and had two daughters who were four and two years old. He spent the next fourteen years in prison.

When Khan was released on parole on June 22, 2020, he received a notice to appear for removal proceedings. He was transferred from prison directly to ICE custody.

Like Rivera, Khan was part of the *Zepeda Rivas* class action. He filed a bail application in which he explained that he was not a danger to the community, because, among other things, the California Parole Board found that he did not pose a risk to public safety when they released him on parole. His application also explained that he was not a flight risk.

Approximately one month later, on July 21, 2020, the judge in *Zepeda Rivas* released Khan, and ICE fit him with an ankle monitor. Several months later ICE imposed more monitoring

conditions on Khan, including serving him with an Order of Supervision and enrolling him in ISAP.

Since Khan was released from ICE detention more than five years ago, he has lived with his mother, who is 66-years-old. She suffers from high cholesterol, diabetes, and high blood pressure. Khan takes his mother to medical appointments, helps with her medication, and is her primary caretaker. Khan has reported to all his check-in appointments with ICE, has complied with all conditions of his release, and does not have any new criminal arrests, charges, or convictions. Khan is now 45-years-old. Over the last five years he has been law abiding. In addition to caring for his mother and being a parent to his two older daughters who are 20 and 22, Khan is also the father of a third daughter who is three years old.

### 2. Immigration Proceedings

Khan appears to be at the beginning of his removal proceedings. The Government issued a superseding Notice to Appear to Khan dated August 22, 2025. Khan filed a motion to terminate these removal proceedings, and the IJ deferred ruling on Khan's motion until the status conference set for December 23, 2025. The record currently before the Court indicates that, unlike Rivera, Khan is not currently subject to a final order of removal.

### D. Procedural Posture of this Action

On September 9, 2025, Petitioners filed the instant petition for writ of habeas corpus and an emergency motion for a temporary restraining order. ECF Nos. 1, 2. Petitioners asserted that the Government was likely to violate their "weighty liberty interest[s] under the Due Process Clause of the Fifth Amendment" and that a TRO was necessary to prevent "imminent unconstitutional detention." *Id.* The Court granted Petitioners' TRO that same day and issued an Order to Show Cause why a preliminary injunction should not issue. The Government responded on September 15, 2025; Petitioners filed their reply on September 18, 2025; and the Court heard argument on September 22, 2025. At the hearing, the Court maintained the terms of the TRO for two weeks and asked the parties for additional briefing on recent decisions that were issued by district courts within the Ninth Circuit. The parties timely filed their supplemental briefs, and the

1   Court extended the terms of the TRO until October 10, 2025, to evaluate the parties' arguments
2   and recent caselaw.

## II. LEGAL STANDARD

An injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The party seeking a preliminary injunction must establish (1) that they are "likely to succeed on the merits," (2) that they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) that "the balance of equities tips in [their] favor," and (4) "that an injunction is in the public interest." *Id.* at 20. In cases where "the Government is the opposing party," the third and fourth factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Where the plaintiff does not establish a likelihood of success on the merits but merely establishes "serious questions going to the merits," a preliminary injunction may still issue if the plaintiff can show that the balance of hardships "tips sharply in [his] favor," irreparable injury is likely, and the injunction is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted).

## III. DISCUSSION

### A. Overview of Caselaw Regarding Immigration Detention Statutes

The current legal framework in immigration habeas cases is muddled and rapidly evolving. To this Court's benefit, several decisions have meticulously summarized the recent and extensive developments in the law within this Circuit. *See, e.g.*, *Avilez v. Garland*, 69 F.4th 525, 529-33 (9th Cir. 2023); *Espinoza v. Wofford*, No. 1:24-CV-01118-SAB-HC, 2025 WL 1556590, at *3 (E.D. Cal. June 2, 2025). The Court does not replicate that fastidious work in this Order but relied on those decisions to provide the necessary context for this decision. Here the Court provides a brief recitation of the authority that applies to the circumstances of this case.

As the Ninth Circuit noted, "[w]here an alien falls within [the immigration] statutory scheme can affect whether his detention is mandatory or discretionary, as well as the kind of review process available to him if he wishes to contest the necessity of his detention." *Prieto-*

8

*Romero v. Clark*, 534 F.3d 1053, 1057 (9th Cir. 2008).[3] Though not discussed in the parties' papers, Rivera and Khan are subject to different detention statutes. In total, "[f]our statutes grant the Government authority to detain noncitizens who have been placed in removal proceedings." *Avilez v. Garland*, 69 F.4th 525, 529 (9th Cir. 2023). Two of those statutes are relevant here, 8 U.S.C. §§ 1226(c) and 1231(a).

Section 1226(c) provides that an "alien" who commits certain offenses "shall" be taken into custody "when the alien is released [from prison], without regard" to the terms of that release. § 1226(c)(1). The government is permitted to release an "alien" subject to § 1226(c) "only if" release is necessary to provide protection to a witness in a government investigation. § 1226(c)(4). The Supreme Court has explicitly held that § 1226(c) facially passes constitutional muster. *Demore v. Kim*, 538 U.S. 510 (2003) (rejecting constitutional challenge because detention § 1226(c) detention contains a "definite termination point" in the form of a final order of removal). Consequently, noncitizens who have committed aggravated felonies may—and, in most circumstances, must—be detained pending an order of final removal. *Id.* "[Section] 1226(c) on its face offers no opportunity for release on bond." *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1197 (9th Cir. 2022) (citing § 1226(c)); *Jennings v. Rodriguez*, 583 U.S. 281 (2018) (rejecting Ninth Circuit holding that § 1226 contains an implicit six-month time limit on the length of mandatory detention).

In contrast, "[§] 1231(a) applies to detention after the entry of a final order of removal," typically the "ninety-day 'removal period' after the conclusion of removal proceedings." *Id.* at 530–31. For those initial ninety days, a noncitizen's detention is mandatory: "[d]uring the removal period, the Attorney General *shall* detain the alien." § 1231(a)(2) (emphasis added). The

---

[3] "Alien" is a term used in the INA, which was enacted in 1952; many cases that address immigration issues and the INA also use that word. The term is now widely considered derogatory because it pejoratively denies and dismisses the humanity of people, including children. As a result, currently advocates and government agencies often choose to use words such as immigrant or non-citizen instead. Here, the Court uses "alien" only when quoting the statute or caselaw. *See Arce v. United States*, 899 F.3d 796, 799 (9th Cir. 2018) ("Following the lead of the United States Supreme Court, we use the term 'noncitizen' throughout this opinion to refer to any person who is not a citizen or national of the United States." (cleaned up)).

statute is especially severe for noncitizens that have aggravated felonies: "[u]nder no circumstance during the removal period shall the Attorney General release an alien who has been found inadmissible" due to the commission of an aggravated felony. *Id.*

After the ninety-day period, the Government may continue detaining noncitizens, but only for "a period reasonably necessary to secure removal." *See Zadvydas v. Davis*, 533 U.S. 678, 699–701 (2001) (six-month period of post-removal detention presumptively reasonable; beyond that, noncitizen is entitled to release provided he demonstrates "good reason to believe there is no significant likelihood of removal in the reasonably foreseeable future").

The detention of "criminal aliens" is governed by its own subsection (§ 1231(a)(6)), and it grants the Government the discretion to detain those individuals beyond the removal period without reference to any bond hearing. § 1231(a)(6). Like § 1226(c), the statute provides no indication that the detainee is entitled to a pre-detention bond hearing. *Johnson v. Arteaga-Martinez*, 596 U.S. at 581 ("[T]here is no plausible construction of the text of § 1231(a)(6) that requires the Government to provide bond hearings before immigration judges after six months of detention, with the Government bearing the burden of proving by clear and convincing evidence that a detained noncitizen poses a flight risk or a danger to the community.").

### B.  Application

The central question in this case is narrow: can the Government detain Rivera and Khan without a bond hearing? The answer is yes. For one, the Supreme Court has ruled multiple times in multiple contexts that §§ 1226(c) and 1231(a) are facially constitutional without a bond hearing for at least a presumptive six-month period following detention. *See Demore* (detention under § 1226(c) is "a constitutionally permissible part of" removal proceedings); *Khotesouvan*, 386 F.3d at 1301 (concluding that the ninety-day period of mandatory detention under § 1231(a)(2) "passes constitutional scrutiny").

Although both Petitioners seek to avoid further detention using an "as-applied" challenge to § 1226(c), on the facts of their individual cases, they cannot succeed. Admittedly, Petitioners are uniquely situated given their court-ordered release in *Zepeda Rivas*. Nevertheless, these

circumstances do not create a constitutional concern. It is true that Petitioners have individualized findings by a sitting federal judge who concluded in 2020 that neither man was a flight risk nor a danger to society. Petitioners have been model citizens since their release in 2020. They have complied fully with all the conditions that ICE has set as part of that release, including regular ICE check-ins. Without question, Petitioners have built meaningful and law-abiding lives in the five years since they left the detention facilities.

But the question before this Court is not whether Petitioners are worthy of a second chance—the facts before the Court indicate that they may well be. Nor is the question whether the Government can detain Petitioners indefinitely without due process, as they fear might come to pass. The only question currently before the Court is whether the Government may re-detain Petitioners without a bond hearing. Under current Supreme Court and Ninth Circuit jurisprudence, the Government may do so without running afoul of the Constitution. As a result, the Petitioners have not demonstrated that they are likely to succeed on the merits, and the Court DENIES the preliminary injunction.

### 1. Rivera

As discussed *infra*, the Government detained Rivera pursuant to § 1226(c) from July 2019 to June 2020. Under the terms of that statute, his detention was mandatory, and he was "not entitled to a bond hearing under § 1226(c) as a statutory matter." *Avilez*, 48 F.4th at 925–27. In June 2020, however, the *Zepeda Rivas* court required the Government to release certain individuals subject to § 1226(c) mandated detention. The court reviewed Rivera's application for relief, found he posed neither a flight risk nor a danger to the community, and released him pursuant to the terms negotiated in the governing settlement agreement. In total, Rivera spent just shy of a year in detention.

Rivera's order of removal became final on December 31, 2020, when the BIA denied Rivera's appeal. At that point Rivera was already out of custody per his individualized hearing in *Zepeda Rivas*. From December 31, 2020, forward, the statute governing Rivera's detention shifted

to § 1231(a). Because Rivera has not been detained since June 2020, he has never been detained under § 1231(a).

Although the first ninety days of detention under § 1231(a) is mandatory, according to *Zadvydas*, an individual may be detained under § 1231(a) for six months without constitutional concern. Even beyond that, the burden is on the petitioner to demonstrate that his detention contravenes the Fifth Amendment: "after a presumptively reasonable six-month period of post-removal period detention, the alien was entitled to release if he successfully demonstrated that there was 'good reason to believe there is no significant likelihood of removal in the reasonably foreseeable future.'" *Prieto-Romero*, 534 F.3d at 1062 (quoting *Zadvydas*, 533 U.S. at 701).

Despite the plain language of the statute, Rivera has not been detained under § 1231(a). If he is detained, it appears likely that he will be removed in the reasonable future. An IJ found Rivera could be removed to his native El Salvador in March 2020. While Rivera appealed that decision and has made several collateral challenges, that finding has been affirmed by the BIA and remains standing. To the Court, it does not appear there are any procedural hurdles on the horizon that would make it unlikely or impossible for the Government to successfully coordinate Rivera's removal to El Salvador, assuming that is what the Government elects to do.

The Court finds the reasoning of *Uc v. Kaiser* persuasive, despite the different fact pattern. Following an order of removal and bond hearing, Uc was placed in ICE custody "pursuant to the mandatory detention provisions of 8 U.S.C. § 1231(a)(6)." *Uc v. Kaiser*, No. 22-CV-04369-CRB, 2022 WL 9496434, at *1 (N.D. Cal. Oct. 14, 2022). After six months, Uc received a second bond hearing, where an IJ held that ICE had not met its burden in showing that Uc was a continued danger or flight risk.[4] *Id.* The Government appealed the IJ's order, but did not move to stay the decision, and Uc was released on bond. *Id.* Nearly two years passed when the BIA granted ICE's appeal, vacated the IJ's bond order, and ordered Uc detained without bond. *Id.* at *2. Uc filed a habeas petition and TRO asking the court to enjoin the Government from re-detaining him without

---

[4] Uc received a second bond hearing because of the Ninth Circuit's holding in *Rodriguez*, a case that the Supreme Court reversed shortly after.

12

a new bond hearing, arguing that he had "a protected liberty interest in his conditional release." *Uc*, 2022 WL 9496434, at *3.

Using the balancing test from *Mathews* to consider Uc's claim, the court found that Uc's liberty interest, though not trivial, was insufficient to trigger a due process violation. The court reasoned that Uc knew "that his release was subject to appellate review" at the BIA and could not reasonably "claim that the government promised him ongoing freedom . . . so long as he complied with the terms of his conditional release." *Id.* Consequently, the court found that Uc had a less "weighty" liberty interest than most, and that the circumstances did not outweigh the weight of the authority and government interests favoring detention. *Id.*

That same reasoning applies here. Petitioners were released on bond within the unique circumstances created by the COVID-19 crisis and the *Zepeda Rivas* settlement agreement. Petitioners could not reasonably "claim that the government promised [them] ongoing freedom . . . so long as [they] complied with the terms of [their] conditional release." That the settlement agreement had an expiration date indicates that Petitioners' release was, for all intents and purposes, temporary. Presumably, had the exigent circumstances caused by the pandemic not occurred, both Rivera and Khan would have remained in detention.

To the extent Petitioners argue that their release from detention under *Zepeda Rivas* entitles them to a liberty interest that they otherwise would not have had, that argument is unavailing. *Cf. id.* ("[Uc's] argument that the regulations allowed ICE to seek an automatic stay of release pending appeal . . . which would have prevented Mr. Uc's release from the start" cannot really have been his preference.") (cleaned up)). The Government should not lose the rights to which it is entitled, *i.e.*, the speedy detention and deportation of noncitizens subject to final orders of removal, because it followed the terms of the settlement agreement. What's more, the Government has diligently attempted to detain and deport Rivera and Khan when the opportunities became available. For both, ICE retrieved Petitioners and placed them in ICE detention on the final days of their prison sentences. ICE now attempts to re-detain Petitioners only three months after the *Zepeda Rivas* agreement expired.

13

### 2. Khan

Much of the analysis above applies with equal force to Khan. A notable factual difference is that Khan's removal proceedings remain pending. Without a final order of removal, Khan's detention is governed by § 1226(c) rather than § 1231(a). As the Supreme Court noted in *Jennings*, § 1226(c) "mandates detention" "until the end of applicable [removal] proceedings." 583 U.S. at 297, 303; *see also id.* at 304 ("[T]he statute expressly and unequivocally imposes an affirmative *prohibition* on releasing detained aliens" for any reason unrelated to witness protection) (emphasis in original)).

Khan's release was the product of exigent circumstances—the text of the statute temporarily giving way in the face of a public health crisis. Those circumstances have no bearing on whether § 1226(c) applies to Khan now that the settlement agreement has lapsed. Khan remains a noncitizen convicted of an aggravated felony, and he is no longer protected by the terms of the *Zepeda Rivas* consent decree. He fits squarely into the population of noncitizens covered by § 1226(c). Like Rivera, Khan could not have had a reasonable expectation that his liberty was guaranteed so long as he maintained his good behavior.

Additionally, Khan's single month in detention does not, as a matter of law, create constitutional concerns. *See Demore* (finding six-month detention under § 1226(c) "for the limited period of [a noncitizen's] removal proceedings" constitutionally sound). Admittedly, neither the Supreme Court nor the Ninth Circuit has provided guidance as to how long (beyond six months) is too long for a non-citizen to spend in detention without a bond hearing. But, given that Khan was only detained for one month in 2020, and his detention is therefore at least five months shy of the term of detention approved in *Demore*, that is not the issue before the Court today.[5]

---

[5] When calculating time spent in detention, courts aggregate nonconsecutive detention periods. The clock does not restart each time that a nonconsecutive detention begins for a noncitizen. *Nguyen v. Scott*, No. 2:25-CV-01398, 2025 WL 2419288, at *13 (W.D. Wash. Aug. 21, 2025); *Sied v. Nielsen*, No. 17-CV-06785-LB, 2018 WL 1876907, at *6 (N.D. Cal. Apr. 19, 2018) (collecting cases).

If or when Khan receives a final order of removal, he will move into the phase of immigration proceedings covered by § 1231(a). Pursuant to that statute, the Government "shall" detain Khan for ninety days to effectuate his removal, and his detention may presumptively last six months without raising constitutional concerns. If or when that detention occurs, Khan is entitled to renew his habeas petition. As things stand now, Khan has not demonstrated that he faces the deprivation of his due process rights should the Government elect to re-detain him. *See Keo v. Warden of the Mesa Verde Ice Processing Ctr.*, No. 1:24-CV-00919-HBK (HC), 2025 WL 1029392, at *8 (E.D. Cal. Apr. 7, 2025), *appeal dismissed sub nom. Keo v. Warden*, No. 25-3546, 2025 WL 2528945 (9th Cir. June 27, 2025) ("Here, because removal proceedings are still actively "pending" and Petitioner is not eligible for relief under 8 U.S.C. § 1226(c)(2), detention is mandatory under § 1226(c).")

## IV. CONCLUSION

For the reasons explained above, Petitioners' motion for a preliminary injunction is DENIED.

Furthermore, the Court issues an ORDER TO SHOW CAUSE why this case should not be dismissed as moot now that Petitioners' requested relief has been preliminarily denied. If Petitioners object to the dismissal of this matter, Petitioners shall file a response to this Order to Show Cause no later than October 24, 2025.

**IT IS SO ORDERED.**

Dated: October 10, 2025

Noël Wise
United States District Judge

15